**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

TRISTON RAY CHILDERS,

      Plaintiff,

v.                              No. 1:21-cv-0056 RB/GBW

THE CITY OF HOBBS; JOSHUA N. GORDON,
a Hobbs Police Department Officer; and SETH M.
FORD, a Hobbs Police Department Officer,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

On January 24, 2019, Wilma Castleman (Wilma) called the Hobbs Police Department (HPD) Dispatch to report a physical altercation between her granddaughter, Tamara Castleman (Tamara), and Tamara's boyfriend, Plaintiff Triston Childers (Childers). Defendants Joshua Gordon and Seth Ford, then officers with HPD, responded. Wilma invited them inside the house and confirmed that Tamara and Childers were arguing. Gordon asked where they were, and Wilma pointed down a hallway and said, "Right there." Gordon turned in the direction she indicated and encountered Tamara, who appeared to be nursing a recent injury. He asked Tamara what was happening. Tamara began to tell him about the argument, and as she talked, she turned and walked down a hallway and entered a bedroom. Gordon followed.

Childers, who was seated in the bedroom, said "Y'all are not gonna talk in my bedroom cuz I'm pissed off. So could you all please go in there, or I can go outside while y'all talk." Gordon ordered Childers two times to leave the bedroom to talk to Ford so that Gordon could continue interviewing Tamara in the bedroom. Childers refused both times. After his second refusal, Gordon attempted to handcuff Childers. Childers physically resisted, and the officers struggled to subdue him. Ford deployed his taser, and Gordon secured the handcuffs on Childers.

1

Childers filed suit and, relevant to this motion, asserts federal claims against Gordon based on unlawful search and entry and unlawful seizure. Gordon moves for summary judgment on the basis of qualified immunity. For the reasons discussed in this Opinion, the Court finds that Gordon is entitled to qualified immunity on both claims and will grant the motion for summary judgment.

## I.    Statement of Facts

On January 24, 2019, Wilma called HPD Dispatch to report that Tamara and Childers were involved in a domestic disturbance. (*See* Doc. 28-B.) Wilma stated that the altercation was "physical." (*Id.* at 1.) She did not know whether either Tamara or Childers had a weapon. (*See id.*) Wilma told Dispatch that she was on oxygen, had heart problems, and was having trouble breathing, and she asked the operator to "hurry." (*Id.* at 1–2.)

Gordon heard this information and responded to the call. (*See* Doc. 28-A ¶¶ 2–3.) He arrived within ten minutes of Wilma's call and was joined by Ford. (*Id.* ¶ 4; *see also* Doc. 28-B at 1.) Gordon activated his body-worn camera (BWC), which recorded the entire interaction. (Doc. 28-A ¶ 5; *see also* Doc. 28-C.) Gordon approached the front entrance of the residence, a perforated metal screen door, and heard a woman's voice from inside tell the officers, "Come in." (Doc. 28-C at 0:00:00–17.) Gordon entered and saw a woman (Wilma) sitting on a couch in the living room. (*Id.* at 0:00:18–21.) He saw that she "had plastic tubing running from her nose to what appeared to be an oxygen tank[,]" which led him to infer that this was the woman who called Dispatch. (Doc. 28-A ¶¶ 13–14 (citations omitted).) He also noticed that she was barefoot and "inferred from her position in the room, her posture, demeanor and age that she was likely the head of the household."[1] (*Id.* ¶ 16.) Gordon said, "Hi, what's going on?" (Doc. 28-C at 0:00:19–21.) Wilma

---

[1] Childers submits an unsigned and unnotarized affidavit in support of his response. (*See* Doc. 42-1.) His attorney notes that Childers "was unavailable to sign the Affidavit" and states that "[t]he record will be supplemented with a signed copy . . . as soon as [Childers] is available to sign." (Doc. 42 at 3 n.1.) Childers never supplemented the record. Noting this deficiency, Gordon contends that "the affidavit is not evidence

responded, "Well they're arguing." (*Id.* at 0:00:22–24.) Gordon asked, "Where they at?" (*Id.* at 0:00:24.) Wilma said, "Right there," and pointed toward the hallway. (*Id.* at 0:00:25–26.)

Gordon moved in the direction Wilma pointed and immediately encountered Tamara. (*See id.* at 0:00:26–27.) He said to Tamara, "Hi, what's going on?" and she answered, "Oh, he's just, I don't know, he had a temper tantrum. I got a ride from an aunt of mine." (*See id.* at 0:00:26–36.) Gordon observed that Tamara appeared "worried or hesitant." (Doc. 28-A ¶ 47(d).) While Tamara talked, she walked through a short hallway and entered a bedroom. (*Id.* ¶ 34; Doc. 28-C at 0:00:26–36.) Gordon followed her, taking her actions to mean "that she wanted [him] to follow her lead." (*See* Doc. 28-A ¶ 29.) He noticed that Tamara, who was wearing a long sleep shirt, "was holding a towel in one hand and nursing what appeared to be a recent bloodied cut or injury to a finger of her other hand and an injury to her wrist." (*Id.* ¶¶ 23–24.)

As Tamara entered the bedroom, still talking, Gordon saw a man (Childers) sitting on the edge of the bed. (*Id.* ¶ 32.) From Tamara's behavior, Gordon believed that she had entered a shared bedroom. (*See id.* ¶¶ 28–31, 60.) Gordon "did not notice any obvious injuries on" Childers. (*Id.* ¶ 37.) Childers did not express surprise at seeing the officers, nor did he get up or try to shut the bedroom door. (*Id.* ¶¶ 36, 38.) He calmly interjected, "Hey, um, look here, I'm gonna stop this here." (Doc. 28-C at 0:00:36–0:00:38.) Gordon said, "Okay," and Childers continued, "Y'all are not gonna talk in my bedroom cuz I'm pissed off." (*Id.* at 0:00:38–40.) Tamara said, "We've, we've been good, I meant he's . . . ." (*Id.* at 0:00:40–42.) Childers continued, "So could you all please go in there, or I can go outside while y'all talk." (*Id.* at 0:00:41–43.)

---

that can be considered for purposes of determining whether [any] fact is in dispute." (Doc. 50 at 2.) The Court agrees. "An unsigned affidavit . . . does not constitute evidence under [Federal Rule of Civil Procedure] 56(e)." *Flemming v. Corr. Corp. of Am.*, 143 F. App'x 921, 925 n.1 (10th Cir. 2005) (citation omitted). Accordingly, the Court will disregard the affidavit in analyzing the motion for summary judgment.

Gordon's "law enforcement training for domestic violence calls dictate[d] that [he] should interview the parties separately . . . ." (Doc. 28-A ¶ 43.) His "training and experience in responding to domestic violence calls had taught [him] that [victims] are often hesitant to provide details when police arrive and can be easily silenced if the perpetrator is there and creates a scene or distraction." (*Id.* ¶ 58.) Thus, when Gordon heard Childers "offer[] to step out of the room so" that Gordon could continue questioning Tamara, he took Childers "up on his offer . . . ." (*Id.* ¶ 49.) Gordon responded, "You come on out here with him," and Ford said, "Come on, come on over here."[2] (Doc. 28-C at 0:00:43–44.) Childers said, "I'm not gonna go out with none of y'all guys." (*Id.* at 0:00:44–46.) Gordon and Childers talked over each other, both still calm, and Gordon again ordered Childers to leave the room to talk to Ford. (*Id.* at 0:00:46–48 ("You're gonna walk out there and talk to him.").) At this, Childers became more agitated, stating, "I'm not talking to a mother fucker cuz I'm not the one . . . ."[3] (*Id.* at 0:00:48–50.) Gordon interpreted Childers's objection to be a "reversal on something that he had just proposed" and it suggested to Gordon that "the situation could be a lot more volatile than it appeared just a few seconds earlier . . . ." (Doc. 28-A ¶¶ 54–55.)

At this point, Gordon believed that Childers "was likely the primary aggressor in a domestic battery or at the least, a domestic assault, based on" his knowledge of the following: (1) Wilma's report that "the dispute had gotten 'physical'"; (2) Gordon's arrival to the residence within ten minutes of Wilma's call; (3) evidence of a recent injury to Tamara's finger and wrist;

---

[2] Childers admits that the officers were clearly ordering him to comply and that neither officer raised his voice, used a threatening tone, or displayed a weapon. (*See* Docs. 28 ¶ 52; 28-A ¶¶ 51, 63–64; 42 at 5.)

[3] Childers asserts that he "clearly objected to the officers' presence in his bedroom." (Doc. 42 at 5.) The evidence shows otherwise, as Childers offered to go outside so that Gordon and Tamara could continue talking in the bedroom. He did not, however, want to *talk* to either officer, whether inside or outside of the bedroom. (*See* Doc. 28-C at 0:00:43–50.)

(4) Tamara's demeanor and her statement that Childers "had a temper tantrum," which Gordon understood to be "an angry outburst of emotion that can be verbal or physical or both"; (5) Childers's interrupting Tamara twice "as she attempted to recount what had happened";[4] (6) Childers immediately telling Gordon that he was "pissed off," which Gordon took to mean that "the dispute, if over, was only recently ended and could erupt again"; (7) his belief that Tamara's behavior "was consistent with [his] observations of how many domestic violence victims behave when law enforcement arrives in response to a call by another family member, which is to minimize or excuse the aggression";[5] (8) the signs that Tamara and Childers shared the bedroom (i.e., Tamara walked in unannounced and then picked up clothes while they talked); and (9) the lack of visible injuries on Childers. (*See id.* ¶ 47 (citations omitted).)

As soon as Childers cursed, Gordon walked toward him and said, "'kay, 'kay, put your hands behind your back." (Doc. 28-C at 0:00:49–51.) Gordon stood up from the bed, backed away, and said, "Don't put your hands on me, I'm not bullshitting, mother fucker." (*Id.* at 0:00:50–52.) Gordon repeatedly ordered Childers to "Stop, stop right now," but Childers pulled his arm away and walked farther away from Gordon and into the bedroom. (*Id.* at 0:00:51–54.) Childers said, "I'm not fucking with you," and used his forearm to push Gordon away. (*Id.* at 0:00:54–57.) The video is not visually clear in the ensuing struggle, but there is the sound of a scuffle and then of a

---

[4] Childers disputes that he "interrupted" Tamara, because he did "not tell Tamara to stop talking." (*See* Doc. 42 at 4.) Regardless of whether he intended to interrupt her, the video shows that Childers spoke over Tamara when she was in the middle of a sentence at least two times, which supports Gordon's understanding of the situation. (Doc. 28-C at 0:00:36–0:00:42.)

[5] Childers denies this factual allegation on the basis that Gordon did not have information "that Tamara had been a victim of domestic violence." (Doc. 42 at 5.) He also denies, without citing admissible evidence, several of Gordon's factual allegations regarding the facts known to Gordon during the incident as well as Gordon's understanding of those facts in light of his experience. (*See id.*) These vague denials, unsupported by admissible evidence, are insufficient to dispute the facts alleged.

taser being deployed. (*Id.* at 0:00:54–58.) Gordon ordered Childers to "Put your hands behind your back right now, man." (*Id.* at 0:00:59–0:01:01.) Gordon turned Childers toward the bed and tried to secure his arms. (*Id.* at 0:01:01–04.) Ford put his taser directly on Childers's back, and Gordon ordered him repeatedly to stop and put his hands behind his back. (*Id.* 0:01:04–09.) Childers continued to struggle, and Ford warned him, "You're gonna get tased again. Stop, you're gonna get tased again." (*Id.* at 0:01:04–15.) Childers said, "I'm not doin' shit, homie," and Gordon snapped the handcuffs into place. (*Id.* at 0:01:11–13.) Childers continued to curse, and Ford deployed the taser a second time. (*Id.* at 0:01:14–20.) Shortly thereafter, Gordon escorted Childers to his patrol car and completed his investigation. (*See* Doc. 28-A ¶¶ 93–94.)

On January 22, 2021, Childers filed a Complaint to Recover Damages for Violations of Civil Rights asserting several federal and state claims. (*See* Doc. 1 (Compl.).) Gordon now moves for summary judgment on Count I Unlawful Entry and Search and Count II Unlawful Seizure. (Doc. 28.)

## II.    Legal Standards

### A.    Summary Judgment Standard

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckab*y, 902 F.3d 1136, 1143 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan*

6

*Cnty. Sheriff's Off.*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* at 1107 (quotation and citation omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

**B.      Qualified Immunity Standard**

The Court reviews summary judgment motions based on a qualified immunity defense somewhat differently. *See Halley*, 902 F.3d at 1144. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." *Id.* (citation omitted). "Generally, 'existing precedent must have placed the statutory or constitutional question beyond debate' to clearly establish a right." *Id.* (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)). "The question is not whether a 'broad general proposition' was clearly established, but 'whether the violative nature of particular conduct

[was] clearly established.'" *Id.* (quoting *Redmond*, 882 F.3d at 935) (internal quotation marks omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quoting *Koch*, 660 F.3d at 1238). And while the "Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, 'a plaintiff's version of the facts must find support in the record.'" *Koch*, 660 F.3d at 1238 (quoting *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). If the plaintiff's "version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it,' then [the Court] 'should not adopt that version of the facts.'" *Halley*, 902 F.3d 1144 (quoting *Thomson*, 584 F.3d at 1312).

## III.   Analysis

### A.   The Court will grant the motion for summary judgment on Count I (Unlawful Entry and Search).

Childers summarily contends that "Gordon neither requested nor received consent to enter [the] bedroom." (Doc. 42 at 15.) Warrantless searches are "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). "Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements." *Ysasi v. Brown*, 3 F. Supp. 3d 1088, 1139 (D.N.M. 2014) (citing *Schneckloth*, 412 U.S. at 219). "When an individual consents to a police search, and the consent is 'freely and voluntarily given,' the search does not implicate the Fourth Amendment." *Id.* (quoting *United States v. Peña*, 143 F.3d 1363, 1366 (10th Cir. 1998)). To show voluntariness, the government must "proffer clear and positive testimony that consent was unequivocal and specific and intelligently given," and establish that the officers did not use "implied or express duress or coercion." *Id.* (quoting *United States v.*

*Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010)). Courts look at the following non-exhaustive list of factors in analyzing whether consent was voluntary:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and [] tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave[;] . . . (vi) the display of a weapon, [and (vii)] physical touching by the officer.

*Id.* at 1139–40 (quotation marks, internal citations, and subsequent citations omitted).

### 1.    Wilma voluntarily consented to the officers' entry.

Gordon asserts that he "reasonably inferred Wilma had authority to admit him" into the residence and to "send him off to look for [Tamara] and [Childers]." (Doc. 28 at 25.) He made this inference based on several factors: "Wilma matched the description that Dispatch provided of the caller," "was seated in a manner and position that made it appear she was no mere guest in the home[,]" invited the officers into the home when she told them to "come in," and "pointed down the hallway of her home and said 'right there[]'" without any attempt to "limit the scope of her consent." (*Id.* (citations omitted).) Gordon cites *United States v. White*, 508 F. App'x 837 (10th Cir. 2013), in support. (Doc. 28 at 25.)

In *White*, the defendant moved to suppress evidence found in his bedroom after his mother led officers inside their home, took them to her bedroom, and pointed to a handgun. 508 F. App'x at 839. White argued that the officers' warrantless entry violated his Fourth Amendment rights. *Id.* at 839–40. He acknowledged that his mother had actual authority to consent to entry but argued that she never expressly consented. *Id.* at 841. The Tenth Circuit found that White's mother gave voluntary implied consent for the officers' entry when she led them into the house and retrieved

the firearm. *Id.* "Consent 'must be clear, but it need not be verbal.'" *Id.* (quoting *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007)). "Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *Id.* (quoting *Guerrero*, 427 F.3d at 789–90).

Here, Wilma told the officers to come in and then indicated down the hallway—both verbally and physically—when Gordon asked where Tamara and Childers were located. The undisputed facts demonstrate that Wilma's consent was voluntary: the officers were calm, polite, and pleasant; they did not request any identification; they did not demand entry or display weapons; and they did not touch Wilma. *See Ysasi*, 3 F. Supp. 3d at 1139. Further, Childers does not argue that Wilma lacked authority to admit the officers into the living room and hallway.[6] *See United States v. Thompson*, 524 F.3d 1126, 1133 (10th Cir. 2008) (noting that the owner of the home "had actual authority to consent to the search of the common areas of the residence"). The Court finds that a reasonable officer would have understood Wilma's conduct to be voluntary, implied consent to enter that shared area of the house to search for the pair.

### 2.     Tamara voluntarily consented to the officers' presence in her bedroom.

Similarly, Tamara gave the officers voluntary, implied consent to follow her down the hall and into what Gordon believed was a shared bedroom. In *United States v. Jones*, officers spoke to the defendant (Jones) outside of his house. 701 F.3d 1300, 1305 (10th Cir. 2012). The sergeant on site told Jones "that the officers would like to search his residence." *Id.* at 1321. Jones unlocked his door, went into his residence, and "made no attempt to stop the officers—through words or otherwise—from following him" inside. *Id.* He also "turn[ed] toward the officers [and made] a

---

[6] Childers argues only that Wilma did not have authority to consent to entry into his bedroom. (*See, e.g.*, Doc. 42 at 2.) He does not, however, argue that *Tamara* did not have the authority to consent to the officers' entry into the bedroom and admits that he shared the bedroom with Tamara. (*See id.* at 2, 4, 17–18.)

gesture with his hands as if to" make a statement. *Id.* The Tenth Circuit found that no reasonable

officer would have interpreted Jones's actions as "refusal of the officers' entry into his residence."

*Id.* The same is true with Tamara's conduct.

When Gordon encountered Tamara in the hall, he politely asked her what was going on.

The officers were not threatening or aggressive, they did not ask for her identification, and they

did not touch Tamara. *See Ysasi*, 3 F. Supp. 3d at 1139. Tamara freely responded to Gordon's

question. As she answered him, she turned and, without prompting, walked down the hallway and

into a bedroom without knocking or requesting permission. Once there, she picked up clothes.

Gordon believed that she jointly occupied the bedroom. She only stopped talking once she was in

the bedroom and Childers spoke over her. A reasonable officer would have understood Tamara's

behavior to be voluntary, implied consent to follow her down the hallway and into her bedroom.

> ### 3.   Childers has not shown that clearly established law put Gordon on notice that Childers's equivocal language effectively revoked Tamara's earlier consent to enter.

Childers asserts that he withdrew any previously granted consent to enter the bedroom.

(Doc. 42 at 15–16.) Childers relies on two cases to show that Gordon's conduct violated his clearly

established Fourth Amendment rights: *Manzanares v. Higdon*, 575 F.3d 1135 (10th Cir. 2009) and

*Georgia v. Randolph*, 547 U.S. 103 (2006).

In *Manzanares*, officers approached the plaintiff (Manzanares) at his home to ask questions

related to an investigation. 575 F.3d at 1140. Manzanares invited the officers into his home and

answered their questions. *Id.* "Eventually, Manzanares decided to end the interview and asked the

officers to leave his home." *Id.* "[T]he officers refused, Manzanares became agitated[,]" and the

officers handcuffed him for "safety reasons." *Id.* The Tenth Circuit found that there was no

"legitimate dispute" that Manzanares withdrew his consent to the officers' presence when he

"unequivocally asked [them] to leave." *Id.* at 1143. Consequently, the consensual encounter with Manzanares ended, and the officers' seizure or "continued presence was permitted only if it comported with the Fourth Amendment." *Id.* (citations omitted).

In *Randolph*, the Supreme Court held that "[p]olice may not search a home or an area of a home with the consent of one tenant in the face of the objection of a co-tenant." (Doc. 42 at 18 (citing *Randolph*, 547 U.S. at 113).) In that case, a wife expressly consented to officers' request to search a home she shared with her husband, while the husband, who was on site, "unequivocally refused" to consent to the search. *Randolph*, 547 U.S. at 107. The Supreme Court found that the officers' search violated the husband's Fourth Amendment rights. *Id.* at 115–16.

*Randolph* and *Manzanares* are factually distinguishable. In *Randolph*, the husband was physically present and immediately disputed permission to search when his wife consented.[7] *Id.* at 107. And in *Manzanares*, the occupant himself initially consented to the officers' presence and then clearly revoked that consent.[8] *Manzanares*, 575 F.3d at 1143. Here, Tamara voluntarily consented to the officers' presence in the shared bedroom, and Childers later attempted to revoke that consent.

---

[7] It is also worth noting that the *Randolph* Court took pains to make clear that its decision "has no bearing on the capacity of police to protect domestic violence victims." 547 U.S. at 118. It noted the difference between the facts at issue in *Randolph* ("when the police may enter to search for evidence") as opposed to those times "when the police may enter without committing a trespass . . . to protect a resident from domestic violence . . . ." *Id.* "[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred . . . however much a spouse or other co-tenant objected." *Id.* This is, of course, what happened here, as Gordon was dispatched to investigate a reported physical altercation between Wilma's granddaughter and her boyfriend.

[8] Childers cites two other cases in support of his argument that "[a]n individual may limit or withdraw his or her prior consent . . . ." (Doc. 42 at 15–16 (citing *Florida v. Jimeno*, 500 U.S. 248, 252 (1991); *United States v. Manjarrez*, 348 F.3d 881, 888 (10th Cir. 2003)).) Both *Jimeno* and *Manjarrez* are inapposite, as they involved traffic stops in which the driver consented to a search of his car. 500 U.S. at 249–50; 348 F.3d at 884.

The *Randolph* and *Manzanares* courts also emphasized the occupants' *unequivocal* refusal or withdrawal of consent. *Randolph*, 547 U.S. at 107 (noting that husband "unequivocally refused" to consent to the search); *Manzanares*, 575 F.3d at 1143 (noting that Manzanares "unequivocally asked [the officers] to leave"). Childers's words cannot be characterized as unequivocal. The BWC video illustrates the confusion—Childers initially attempted to deny entry into the bedroom (Doc. 28-C at 0:00:38–0:00:40 ("Y'all are not gonna talk in my bedroom"), then immediately equivocated and consented to their entry a second later (*id.* at 0:00:41–43 ("So could you all please go in there, or I can go outside while y'all talk.").) Neither *Manzanares* nor *Randolph* clearly establishes that an officer violates an individual's Fourth Amendment rights where the individual does *not unequivocally* refuse or revoke voluntary consent given earlier by a co-tenant.

In his opening brief, Gordon argues that *Randolph* "drew a very narrow rule" that requires the objecting co-tenant to "be present at the threshold and expressly object in order to nullify a co-tenant's express consent." (Doc. 28 at 20 (citing *Randolph*, 547 U.S. at 121) (emphasis omitted).) Gordon cites three federal circuit courts of appeal opinions that "have read *Randolph* as requiring that an objecting co-tenant make his objections clearly known before police have been granted entry to the home." (*Id.* at 35–36 (citing *Hays v. Bolton*, 488 F. App'x 971, 977 (6th Cir. 2012); *United States v. Witzlib*, 796 F.3d 799, 801–02 (7th Cir. 2015); *United States v. Coleman*, 909 F.3d 925, 930 (8th Cir. 2018)).) The facts in *Hays* and *Coleman* are closer to those here.

In *Hays*, a homeowner (Hays) purposely locked his daughter out of their shared home. 488 F. App'x at 973. The daughter called 911 for help retrieving her belongings, and she admitted officers into the home. *Id.* at 974. Hays later came out of his bedroom and objected to the officers' presence. *Id.* Hays filed suit and argued that, under *Randolph*, "his objection to their presence withdrew [his daughter's] consent and invalidated his subsequent arrest." *Id.* at 977. The Sixth

Circuit disagreed and opined that *Randolph* "specifically cabins an objecting co-tenant's power, . . . giving him effect only when he voiced his objection as part of the initial discussion of consent to enter the premises." *Id.* (citing *Randolph*, 547 U.S. at 121). In *Coleman*, a woman called 911 and stated that the defendant (Coleman) hit her and had a weapon. 909 F.3d at 929. When an officer arrived, the woman opened the door and entered with the officer. *Id.* Inside the house, Coleman objected to the officer's presence and later argued that the officer violated his rights under *Randolph*. *Id.* at 929–30. The Eighth Circuit found that *Randolph* did not apply, as its holding "made clear that a co-tenant's consent to entry will suffice if a potential objector is nearby but not part of the threshold colloquy." *Id.* at 930 (citing *Randolph*, 547 U.S. at 121; *United States v. Hudspeth*, 518 F.3d 954, 960 (8th Cir. 2008)). Because "Coleman did not object until after [the officer] entered the residence with [the woman's] consent to investigate her report of domestic violence[,]" the officer did not violate Coleman's Fourth Amendment rights.[9] *See id.*

Childers cites one relevant case in response to Gordon's discussion of *Randolph* in light of *Hays* and *Coleman*: *Gates v. Texas Department of Protective & Regulatory Services*, 537 F.3d 404 (5th Cir. 2008). (Doc. 42 at 15.) In *Gates*, the Fifth Circuit interpreted *Randolph* to hold that when an individual gives officers consent to search, an absent co-tenant may "revoke[] that consent upon his return home . . . ." 537 F.3d at 426; *but see Fernandez v. California*, 571 U.S. 292, 306 (2014) ("emphasiz[ing] that [*Randolph*'s] holding was limited to situations in which the objecting occupant is physically present"). It is worth noting that the Tenth Circuit cited *Gates* in *Manzanares*. *Manzanares*, 575 F.3d at 1143 (citing *Gates*, 537 F.3d at 426 (("[I]f . . . [one of the plaintiffs] revoked that consent upon his return home, the defendants violated the [plaintiffs']

---

[9] The circumstances here do not exactly mirror those in *Hays* and *Coleman*, as Gordon did not obtain Tamara's consent to enter the bedroom at the "threshold" of the house, but only after he had first received consent from Wilma to enter the house.

Fourth Amendment rights by remaining in the house, absent a court order or exigent circumstances.")). Of course, the circumstances in *Manzanares* were different from those in *Gates*, and the Tenth Circuit was not making an express ruling on the issue before this Court. *Gates* only serves to underscore a finding that the law on this issue was not clearly established.

In sum, the Court finds that Childers fails to show that clearly established law would have put Gordon on notice that his actions violated Childers's rights. As a result, Gordon is entitled to qualified immunity on the claim of Unlawful Entry and Search in Count I.

**B.      The Court will grant the motion for summary judgment on Count II (Unlawful Seizure).**

**1.      Childers has not established that Gordon needed exigent circumstances to arrest him.**

Childers largely bases his argument regarding the arrest on his revocation of consent. (*See* Doc. 42 at 8–10.) Assuming Childers validly revoked his co-occupants' consent to be present in the bedroom, then clearly established law dictates that Gordon needed exigent circumstances to make a warrantless arrest. *See Manzanares*, 575 F.3d at 1144. Gordon does not argue otherwise. Rather, he simply argues that he was in the bedroom pursuant to lawful consent; thus, he did not need exigent circumstances for the arrest. (*See* Doc. 50 at 9–10.) Because there is no law that clearly establishes Childers's revocation was valid, the Court is satisfied that exigent circumstances were not necessary for Childers's arrest.

**2.      No clearly established law supports a finding that Gordon's order was a seizure requiring independent probable cause.**

Alternatively, assuming Gordon was lawfully present in the bedroom, Childers argues that the order to exit the bedroom was not lawful and thus did not give Gordon probable cause to arrest

him under N.M. Stat. Ann. § 30-22-1(D).[10] (*See* Doc. 42 at 20–21 (discussing *New Mexico v. Phillips*, 203 P.3d 146, 151 (N.M. Ct. App. 2009)).) "Once lawfully inside the home, an officer may effect a warrantless arrest that is supported by probable cause." *Callahan v. Millard Cnty.*, 494 F.3d 891, 897 (10th Cir. 2007), *rev'd sub nom. on other grounds Pearson v. Callahan*, 555 U.S. 223 (2009) (citing *United States v. Cruz-Mendez*, 467 F.3d 1260, 1269 (10th Cir. 2006)); *see also Beattie v. Smith*, 543 F. App'x 850, 859 (10th Cir. 2013) (finding "no clearly-established law holding that where valid consent has been given to the officer's entry into the suspect's dwelling, the officer must also show that probable cause and exigent circumstances justified the arrest that took place there") (citations omitted).

Section 30-22-1(D) criminalizes "resisting or abusing any . . . peace officer in the lawful discharge of duties."

> To establish a defendant's guilt for resisting officers under New Mexico's § 30-22-1, a party must show that: (i) the officer who gave the orders was lawfully discharging his or her duty; and (ii) the defendant, with the knowledge that the officer was attempting to apprehend or arrest the defendant, fled, attempted to evade, or evaded the officer.

*Ward v. City of Hobbs*, 398 F. Supp. 3d 991, 1106–07 (D.N.M. 2019) (citing *New Mexico v. Gutierrez*, 162 P.3d 156, 166 (N.M. 2007)). At issue here is the first element. For the order to be made in the "lawful discharge" of one's duties, it "must have rested on adequate reasonable

---

[10] Childers also contends that "[t]he Tenth Circuit [has] recognized that under New Mexico law, '[r]esisting, evading, or obstructing an officer primarily consists of physical acts of resistance.'" (Doc. 42 at 11 (quoting *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2008)).) Since *Keylon*, however, the Tenth Circuit has noted that "[t]he New Mexico Court of Appeals has so far interpreted the phrase 'resisting or abusing' in section 30-22-1(D) to prohibit three types of conduct: (1) 'physical acts of resistance,' (2) the use of 'fighting words' to attack an officer, and (3) the refusal to 'obey' lawful police commands." *United States v. Romero*, 935 F.3d 1124, 1128 (10th Cir. 2019) (citing *New Mexico v. Wade*, 667 P.2d 459, 460–61 (N.M. Ct. App. 1983); *New Mexico v. Diaz*, 908 P.2d 258, 259–62 (N.M. Ct. App. 1995); *New Mexico v. Jimenez*, 392 P.3d 668, 682 (N.M. Ct. App. 2017) ("[A]nother way a person can violate Subsection (D) is by avoiding doing something required, including refusing to comply with an officer's orders.")). Thus, an arrest under § 30-22-1(D) for violating a lawful order would not per se violate one's constitutional rights.

suspicion, probable cause, and/or exigent circumstances." *Id.* at 1107 (citing *Storey v. Taylor*, 696 F.3d 987, 993 (10th Cir. 2012)); *see also Phillips*, 203 P.3d at 151 ("whether an officer is acting lawfully is measured by his actual legal authority, including common-law, statutory, or constitutional limitations on the officer's authority") (citations omitted).

Because Gordon was in his home, Childers argues that the order itself constituted a seizure and needed to be supported by probable cause. (Doc. 42 at 10.) Ordinarily, "[w]hen an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (quoting *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991)). Childers did not submit to Gordon's order to exit; thus, Gordon defines this interaction as an "attempted seizure." (*See* Doc. 28 at 5 (noting Gordon's "attempt to seize [Childers] by ordering him out of the bedroom").)

Childers relies[11] on two cases: *Storey v. Taylor* and *Lundstrom v. Romero*, 616 F.3d 1108 (10th Cir. 2010).  In *Storey*, the Tenth Circuit found that an officer's order to exit the house, absent exigent circumstances, was unlawful. 696 F.3d at 993–94. Because the order was unlawful, the Tenth Circuit held that the officer did not have probable cause to arrest the individual under § 30-22-1(D) for failure to obey that order. *See id.* In *Lundstrom*, the Tenth Circuit found that an individual was unlawfully "seized for purposes of the Fourth Amendment when he complied with the officers and dispatcher's orders to leave his house." *Lundstrom*, 616 F.3d at 1123–24 (citation omitted). Both cases are distinguishable, as the officers in *Storey* and *Lundstrom* were not present in the homes with consent. Because Gordon was lawfully present with consent, neither case

---

[11] Childers does not fully develop any argument that Gordon's order was unlawful even if he did not need exigent circumstances. (*See* Doc. 42.) For example, he cites *Storey* and *Lundstrom* to show that Gordon needed probable cause *and* exigent circumstances to arrest him. (Doc. 42 at 9–10.) The Court has already found that the law was not clearly established that Gordon needed exigent circumstances here.

provides on point authority to show that Gordon's order, without more, constituted a seizure that required independent probable cause. *Cf. Crall v. Wilson*, 769 F. App'x 573 (10th Cir. 2019) (declining to find that *Storey* provided clearly established law that an officer illegally seized an individual where the officer was lawfully present pursuant to a warrant).

Still, Gordon acknowledges language from *Storey*, which states that "a sufficiently coercive order requiring an individual to leave his own house counts as a seizure subject to the protections of the Fourth Amendment." *Storey*, 696 F.3d at 993 (citing *Lundstrom*, 616 F.3d at 1124) (subsequent citations omitted). (*See* Doc. 28 at 22.) The Court finds that language from *Manzanares*, which Childers does not discuss, is also helpful. In determining that Manzanares was "seized" when he asked the officers to leave and they refused, the Tenth Circuit noted that "as soon as an individual has 'an objective reason to believe that he is not free to terminate [an encounter],' he is 'seized,' and the Fourth Amendment is implicated." 575 F.3d at 1143 (quoting *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999)). Here, viewing the facts in a light most favorable to Childers, Childers had objective reason to believe he was not free to end the encounter with the officers. Gordon agrees that he was trying to seize Childers. He ordered him twice to go out and talk to Ford, and when Childers disagreed the second time, Gordon moved to handcuff him. Gordon's order was arguably a seizure for purposes of the Fourth Amendment. To be lawful, Gordon needed probable cause to arrest Childers for a crime *before* he issued the order. *See Phillips*, 203 P.3d at 620.

Again, however, Childers has not met his burden to identify authority to show that a reasonable officer would understand that ordering Childers out of his room would constitute a seizure where the officer was lawfully present pursuant to a co-occupant's consent. In other words, Childers fails to establish that "the contours of [his right under the Fourth Amendment were]

sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001) (quotation omitted). Accordingly, Gordon is entitled to qualified immunity on this basis.

### 3. Childers has not shown that Gordon's order was an attempt to criminalize the assertion of constitutional rights.

Childers also argues that the arrest was unlawful because his refusal to obey Gordon's order was a protected objection to police activity and a valid assertion of his constitutional rights. (Doc. 42 at 13–14.) Childers cites *City of Houston, Texas v. Hill*, 482 U.S. 451, 453 (1987), for example, where the Supreme Court found that "a municipal ordinance that makes it unlawful to interrupt a police officer in the performance of his or her duties [was] unconstitutionally overbroad." In that case, the defendant (Hill) approached an officer questioning someone on the street and shouted "in an admitted attempt to divert [the officer] from" his investigation. *Id.* The officer responded, "[A]re you interrupting me in my official capacity as a Houston police officer?" *Id.* at 454. When Hill replied "Yes, why don't you pick on somebody my size[,]" the officer arrested him under the ordinance for willfully interrupting an officer. *See id.* "The record from the district court showed that the ordinance at play was 'officially regarded as penalizing the mere interruption of a police[ officer] while in the line of duty.'" (Doc. 42 at 13 (quoting *Hill*, 482 U.S. at 457)[12].) Here, although Gordon believed that Childers interrupted Tamara in an effort to obstruct the investigation, he did not arrest him for the *interruption*, but for his express refusals to comply with repeated orders to exit the bedroom. Thus, Gordon did not arrest Childers in an effort to "censor" or punish him for verbally objecting to the investigation. (*See id.*)

---

[12] The other cases Childers relies on are similarly unavailing. (*See id.* at 11–13 (citing, *e.g.*, *New Mexico v. Doe*, 583 P.2d 464, 465 (N.M. 1978) (finding that officers lacked probable cause to make an arrest under a disorderly conduct statute); *Guffey v. Wyatt*, 18 F.3d 869, 871–72 (10th Cir. 1994) (examining an Oklahoma obstruction statute in the context of a referee's refusal to obey an officer's order to call more fouls during a basketball game)).)

### 4. Alternatively, Gordon had arguable probable cause to arrest Childers for battery against a household member.

Gordon contends that even if he did not have probable cause to arrest under § 30-22-1(D), the arrest was justified because he had arguable probable cause to believe Childers had committed battery on a household member in violation of N.M. Stat. Ann. § 30-3-15(A). (Doc. 28 at 41.) "In the context of a qualified immunity defense on an unlawful search or arrest claim, [courts] ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (quotation marks and citation omitted). "Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists." *Id.* (citing *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007)). "A defendant 'is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff.'" *Id.* (quoting *Cortez*, 478 F.3d at 1120).

"Battery against a household member consists of the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry manner." § 30-3-15(A). Gordon knew the following facts at the time he arrested Childers: Wilma called dispatch regarding a domestic disturbance that had gotten physical and asked officers to hurry. Gordon encountered Tamara at the house within ten minutes of the call. Tamara was nursing what appeared to be a recent injury and explained that Childers had a "temper tantrum." Childers immediately (but calmly) told Gordon that he was "pissed off" when Gordon saw him in the bedroom. Gordon did not see any injuries on Childers. Childers interrupted Tamara twice, and Tamara responded by saying that "we've been good." Based on his observations of how many domestic violence victims behave in response to law enforcement calls, Gordon understood Tamara's words to be a minimization or excuse of Childers's aggression. When Gordon ordered

Childers to talk to the other officer about what had happened, Childers cursed and became agitated, leading Gordon to believe the situation was more volatile than he initially suspected. (*See* Doc. 28-A ¶¶ 47–55.)

From these facts, Gordon contends that a reasonable officer could conclude that Childers had committed a battery. (Doc. 28 at 41.) Childers disagrees and argues that Gordon never asked either party if Childers had injured Tamara. (Doc. 42 at 14.) He cites only one case in support of his argument: *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012). In *Morris*, "a motorist alerted [an officer] to a domestic disturbance at a residence . . . ." *Id.* at 1189. The officer encountered three people at the residence yelling at each other and saw evidence of property damage. *Id.* One of the three (Morris) approached a second (Bell) and spoke to him, and Bell backed toward the officers. *Id.* at 1190. The officers arrested Morris for assault, defined as "any willful and unlawful attempt or offer with force or violence to do a corporal hurt to another." *Id.* at 1190, 1193 (quoting 21 Okla. Stat. Ann. § 641). The Tenth Circuit found that the officer did not have probable cause to arrest Morris for assault, as he "was unarmed, . . . never approached within reach of Bell[, and] . . . did not threaten Bell with words or gestures." *Id.* at 1193. *Morris* is distinguishable, as the officer there did not receive information that the domestic disturbance was physical, did not observe any injuries on Bell, and arrested Morris based on an incident that occurred in his presence.

Childers cites no authority that would have put a reasonable officer on notice that the facts known to Gordon were insufficient for a probable cause finding. Indeed, the Court's own search has yielded little caselaw on point. In *New Mexico v. Romero*, the state appellate court found that officers had sufficient probable cause to arrest an individual for domestic battery under a previous statute (§ 31-1-7(A)) where they "observed signs of violence at the scene . . . ," the couple told the officers they argued, the defendant denied they engaged in a physical altercation, and the woman

told officers that the "[d]efendant had held [her] face during the argument." 28 P.3d 1120, 1123 (N.M. Ct. App. 2001). In *West v. Scifres*, officers responded to a report from an off-duty officer who saw West "punching his wife . . . ." No. CIV 00-1329 LCS, 2001 WL 37125081, at *4 (D.N.M. July 2, 2001). The wife admitted that she and West "engaged in 'horseplay' in the parking lot[,]" and West explained that they were only playing. *Id.* The court found that "a reasonable officer could have believed that there was probable cause to arrest" West under § 30-3-15, because "officers are entitled to rely upon information relayed to them by other officers in determining whether there is probable cause to arrest." *Id.* (citations omitted). And in *Griego v. City of Albuquerque*, the court found that an officer had probable cause to arrest under § 30-3-15(A) where the parties both admitted that there was a physical struggle and the officer saw marks and redness on one of the two. No. CIV 13-0929 JB/KBM, 2015 WL 7873801, at *1, 19 (D.N.M. Oct. 20, 2015).

The Court agrees that Gordon could have asked a more pointed question before arresting Childers. At the same time, Gordon was trying to conduct his interview when Childers became agitated. The Tenth Circuit has "held that a bare allegation of wrongdoing, without any investigation, in some circumstances, may not give rise to probable cause." *Cortez*, 478 F.3d at 1119. In *Baptiste v. J.C. Penney*, for example, the Tenth Circuit "affirmed the denial of qualified immunity for officers who relied solely on the statements of store security guards—despite having seen a contradictory security videotape capturing the events in question—to establish probable cause for arrest." *Id.* (citing *Baptiste*, 147 F.3d 1252, 1254 (10th Cir. 1998)). And in *Cortez*, the Tenth Circuit found that officers were not entitled to qualified immunity where they relied "exclusively on the double-hearsay statement of a nurse who had no personal knowledge of the actual facts." *Id.* (emphasis omitted). Gordon's reliance on the facts known here was not so

22

egregious. Childers does not argue that Gordon had contradictory or untrustworthy information. The Court finds that Gordon had arguable probable cause to arrest Childers under § 30-3-15(A).

## IV.     Conclusion

Gordon is entitled to qualified immunity for the claims of unlawful entry and search and unlawful seizure. Childers fails to identify clearly established law that would put a reasonable officer on notice that ignoring an individual's equivocal attempt to revoke his co-occupants' previously-granted voluntary consent to enter a house and bedroom would violate the individual's Fourth Amendment rights. Further, Childers points to no authority to show that the arrest here violated his clearly established rights. "Qualified immunity . . . shields officers who have "reasonable, but mistaken beliefs,' and operates to protect officers from the sometimes 'hazy border[s]' of the law." *Griego*, 2015 WL 7873801, at *10 (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). As evidenced by Childers's failure to find caselaw on point for each issue he raised, the officers' continued presence and the warrantless arrest here fell within those hazy borders, and Gordon is entitled to qualified immunity on both counts.

**THEREFORE,**

**IT IS ORDERED** that Defendant Joshua N. Gordon's Motion for Summary Judgment based on Qualified Immunity as to Counts I and II (Doc. 28) is **GRANTED**. Counts I and II will be dismissed with prejudice.[13]

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

[13] The parties have stipulated to the dismissal of all claims against Ford. (*See* Doc. 53.) Counts IV through VI remain. (*See* Compl.)